93 So.2d 245 (1957)
Elza FONTENOT, Plaintiff-Appellant,
v.
R. L. MYERS, d/b/a Myers Garage, Defendant-Appellee.
No. 4320.
Court of Appeal of Louisiana, First Circuit.
January 2, 1957.
Rehearing Denied March 25, 1957.
*246 Tate & Tate, Mamou, for appellant.
Guillory & Guillory, Eunice, for appellee.
TATE, Judge.
While roping cattle at work for defendant Myers on April 15, 1955, plaintiff Fontenot allegedly sustained a rope burn on his left hand which due to subsequent complications, remains disabling. Plaintiff appeals from judgment dismissing his suit for workmen's compensation benefits.
The District Court's reasons for judgment, in full, are:
"The evidence shows that if, as a matter of fact, the plaintiff was injured while in the employ of the defendant, the injury was received while engaged in working with cattle which were owned by the defendant and kept at a place separate from that of defendant's main business, an automobile wrecking and junk yard.
"The plaintiff was employed to sell parts from wrecked automobiles which had been purchased by the defendant and placed on his junk yard. The plaintiff's salary was $5.00 a day or $30.00 a week and a house to live in.
"It is the Court's impression from the testimony that the cattle operation was separate and distinct from the junk yard and the plaintiff's connection therewith was under a separate agreement under which the plaintiff was to milk and look after the cattle, for which he received half of the milk.
"Consequently, the Court is of the opinion that there should be judgment in favor of the defendant and dismissing plaintiff's suit."
The uncontradicted facts reveal that plaintiff was employed by Myers, the defendant, at a daily wage of $5 a day. He worked a 10-hour day, from two to three hours on a farm belonging to the defendant, and approximately seven hours a day in a junk yard, operated and owned by the defendant. In addition to the cash wage, plaintiff received free housing at the junk yard site and retained approximately three quarts of milk per day from the defendant's cows.
Plaintiff's employment in the junk yard consisted of selling parts from wrecked automobiles, some of which he would remove with small hand tools from the junked cars. In the morning and in the late afternoon, plaintiff went to defendant's farm, which was approximately a mile or two away from the junk yard, to milk 1-2 cows belonging to the defendant, and to feed approximately 60 other cattle.
Whether defendant's affirmative answer on Tr-16 to a long question lumping all of plaintiff's alleged duties indicates an intentional response admitting plaintiff's performance of such undoubtedly hazardous duties at the junk yard as operating defendant's wrecker, delivering parts, etc., is disputed by counsel (but of Tr-132, where defendant Myers admitted plaintiff had the use of defendant's truck around the junk-yard); but is in our view immaterial, since *247 LSA-R.S. 23:1035 specifically provides that the Louisiana workmen's compensation act "shall also apply to every person performing services arising out of and incidental to his employment in the course of his employer's trade, business, or occupation in the following hazardous trades, businesses and occupations: The operation, construction, repairs, removal, maintenance and demolition of * * * junk yards * * *". (Italics ours.)
Whether comparatively hazardous or not, the work of selling and dismantling junked parts is "a part of the principal physical operations of a business which the act specifically designates as hazardous" so as to entitle an employee injured in the course of these duties to compensation, Malone, Louisiana Workmen's Compensation Law, Section 98 et seq., quoted p. 116. The Legislature has specifically declared that the business of operating a junk yard is hazardous and that the employees engaged therein are protected by the compensation act. It is not open to the courts to question this classification, or to attempt to segregate the ordinary work involved in such operation into hazardous and non-hazardous duties, and then affirm the coverage of the act as to one and deny it to the other.
But the employee in the present case was not injured in the performance of the duties which can be attributed specifically to operation of the junk yard.
We cannot agree that the cases cited can be relied upon to support the District Court's legal conclusion and the defendant's astutely argued contention that because the cattle operations of the defendant were separate and distinct from the business of the junk yard, plaintiff ipso facto cannot recover compensation for injuries sustained in the cattle operations.
Mitcham v. Urania Lumber Company, La.App. 2 Cir., 185 So. 707, and Caldwell v. George Sproull Co., La.App. 2 Cir., 164 So. 651, affirmed 184 La. 951, 168 So. 112, are simply authority for the proposition that when an employer maintains two businesses, one hazardous and the other non-hazardous, an employee engaged to perform duties solely in the non-hazardous business and injured at said work cannot recover compensation simply because his employer maintains other and separate operations covered by the act. Brownfield v. Southern Amusement Company, 196 La. 73, 198 So. 656, simply holds that occasional performance of hazardous duties by one employed in a non-hazardous business does not render compensable an accident sustained in the performance of non-hazardous duties.
Thus, in the present case, if Fontenot had been employed solely to perform duties in connection with the cattle business, an accident while at work thereat would not have been compensable just because the employer also maintained the hazardous business of the junk yard or just because Fontenot occasionally had performed duties in connection with this other and hazardous business.
As stated in the Brownfield case, 198 So. 660, "It is well settled in this State that where an employee is engaged in both hazardous and nonhazardous work in the same employment, his injury is compensable though it may occur in the performance of a nonhazardous portion of his work Byas v. Hotel Bentley, 157 La. 1030, 103 So. 303."
A comprehensive discussion of the question is contained in the decision of this Court in Harrington v. Franklin's Stores Corporation, 55 So.2d 647, 649, wherein after remarking that "the nature of the employer's business and not the particular work done by the employee is the determinative factor" in deciding whether a given employment is covered by the compensation act, we summarized the Byas case as holding as to a "partially hazardous employment" that "where an employee is required to discharge both hazardous and nonhazardous duties it is immaterial that the injury occurred while he was engaged in non-hazardous work." We distinguished that *248 situation, wherein compensation is allowed even where the injury occurs while performing non-hazardous duties, from the Brownfield situation, `when the employee performs only occasionally acts that can be regarded as hazardous, and is injured in the course of his normal nonhazardous work", wherein compensation is not allowed.
We cannot construe the record to support a finding that plaintiff enjoyed two separate employments with defendant, one in the hazardous junk business, and one in the non-hazardous cattle business. Plaintiff was paid but one wage, $5 per day, plus his house, and the major portion of his duties was in the junk business, although he was required to spend two or three hours per day attending defendant's cattle. We do not feel that the evidence supports a finding that the plaintiff milked defendant's cows and fed his cattle for 2-3 hours per day, for the obviously inadequate compensation of three quarts of raw milk a day; we feel, rather, the employee's cattle duties were incidental to those of his major employment at the junk yard at $5 per day. Plaintiff had started working for defendant in 1952 as a car salesman, and had then been transferred to the junk yard as defendant went out of the used car business; the bulk of the cattle were bought 5-6 months before the alleged accident, in a fattening or feeder operation, and they were sold in June of 1955, a month or so after the accident.
The situation is similar to that in Dobson v. Standard Accident Insurance Company, 228 La. 837, 84 So.2d 210, where an employee engaged in an admittedly hazardous business was sent by his employer to perform repairs at the employer's residence. The Supreme Court rejected the contention that such personal services were not incidental to the covered employment, quoting from Kern v. Southport Mill, 174 La. 432, 141 So. 19, 20, and holding, 84 So.2d 212:
"* * * whenever the employer calls upon the employee to render any particular service, he, at least (that is to say, the employer himself), is in no position any longer to deny that the services thus requested arise out of and are incidental to the employment. Otherwise, by what right has the employee been called upon to perform them?"
Studious and ingenious counsel for defendant also relies upon cases such as Dewey v. Lutcher-Moore Lumber Company, 151 La. 672, 92 So. 273, Gray v. Tremont Lumber Company, La.App. 2 Cir., 185 So. 314, and Hinton v. Louisiana Central Lumber Company, La.App. 2 Cir., 148 So. 478, which held that non-hazardous employments (such as janitor or scavenger) incidental to logging operations (specified as hazardous by the compensation act) were not covered. These cases are distinguishable because the employee's duties therein consisted solely of non-hazardous duties which were not part of the principal physical work of loggingwhereas in the present situation, the employee's duties were part of the principal physical operations of operating a junk yard which operations themselves the legislature has declared to be hazardous. Further, there is some question as to the validity of the holdings of these cited cases, in view of the later jurisprudence: Cf. Speed v. Page, 222 La. 529, 62 So.2d 824, which awarded compensation to an employee of an admittedly hazardous business, although employed to perform and engaged in activities merely incidental thereto at the time of the accident; Rigsby v. John W. Clark Lumber Company, La.App. 1 Cir., 28 So.2d 346, certiorari denied, where a sawmill clerical worker was held covered by the compensation act.
We therefore find that plaintiff's employment was subject to the Louisiana workmen's compensation act as containing partly hazardous and partly non-hazardous features, so that an injury received in performance of either type of duties is compensable under the Byas v. Hotel Bentley rule.
*249 However, defendant very seriously disputes the occurrence of an accident, and also that plaintiff is presently disabled by reason of same.
The plaintiff positively testified that he received a rope burn or blister on his left ring finger while roping cattle at about 10 o'clock in the morning. (On the morning of the accident, defendant had taken about six employees to his farm to spray and de-horn his cattle.) He testified that defendant furnished some disinfecting alcohol for the injury. Defendant denies such testimony with equal positivity.
Four co-employees testified, one called by defendant, and three by plaintiff. Although all four denied having seen the actual accident, three of them admitted that either the following day or two or three days later plaintiff commenced to complain of and to show his swollen and infected hand. One explained as a misunderstanding an earlier statement he had signed indicating that he had heard plaintiff complain immediately after the accident, as against his testimony on the stand that it was not until the following day that he heard plaintiff start to complain. Plaintiff's wife corroborated his complaints of the rope burn immediately upon his return home that night. Plaintiff gave the same version of the accident to the general practitioner to whom plaintiff was taken by defendant about a month after the accident, and to the two specialists, as that to which he testified.
We note that the District Court specifically did not make a contrary factual finding in the resolution of this factual issue, which would have disposed of the suit, but instead based its conclusion upon a legal question which we have resolved adversely to the contentions of defendant.
Under all the circumstances of this suit, and in the absence of a contrary finding by the District Court, we feel that the plaintiff has proved that an accident has occurred by a preponderance of the evidence, taking into consideration also his prior uninterrupted employment with defendant and lack of disability and his testimony as corroborated by surrounding circumstances and subsequent undoubted disability. Fee v. Calcasieu Paper Company, Inc., La.App. 1 Cir., 89 So.2d 434; Turner v. Southern Industries Company, La.App. 1 Cir., 88 So.2d 238, certiorari denied; Zito v. Standard Accident Insurance Company, La.App. 1 Cir., 76 So.2d 25.
There remains the question of the duration and extent of disability.
Trial was held on May 31, 1956. Plaintiff complained at this date of stiffness, and loss of use and strength in the ring and little fingers of his left hand, producing total disability to use the small tools of his occupation as junk-dismantler. That the trivial injury of the rope burn produced such serious complaints seems to have been due, in part, to a predisposition on the part of plaintiff to skin infections (see testimony of Dr. Stagg, Tr-118-119) and to possible complications and disuse following the infection and lancing of the infected area.
The testimony of Dr. Charles Hatchette, orthopedic specialist, was taken by defendant on February 1, 1956. He had examined plaintiff once, on October 4, 1955. The substance of his findings is as follows:
"* * * The examination was confined principally to the left hand and this showed mild swelling of the third, fourth, and fifth fingers with most of the swelling in the fourth finger. The distal end of the fourth finger was markedly atrophied * * *. Motion of the third, fourth and fifth fingers were limited about 50% and he could not make a fist or flex the fingers completely. He was unable to grasp small objects with the left hand. The glistening appearance of the distal portion of the fourth finger and atrophy indicated that there had been some nerve involvement possibly at the site of the old infection * * *.

*250 It was my impression that this man had received some nerve injury to the fourth finger which was responsible for his inability to move it. There is considerable atrophy beyond the proximal joint indicating there has been nerve involvement. This was possibly due to the infection which was present in the finger. It was my recommendation to Mr. Fontenot that he use a ball in order to rehabilitate the fingers. There was considerable numbness of the fourth finger beyond the proximal joint which bore out the impression that there was some nerve injury through the infection. Approximately four to six months was estimated as a requirement for this man to flex the fingers completely and return to his usual duties." (Tr-104-105.)
Dr. Hatchette further stated that this loss of flexion "might be total disability if this handyman had to grasp small objects." (Tr-105.)
Dr. George Briel, orthopedic specialist, testified on behalf of plaintiff by deposition taken January 31, 1956. He had examined plaintiff June 27, November 1, November 22, and December 12, 1955.
Dr. Briel found at his final examination, after improvement from earlier occasions, that the ring finger was approximately 75% disabled and the little finger 30% disabled by reason of stiffness and loss of flexionthe left hand as a whole about 15 to 20% disabled. He further stated, Tr-91, "I felt the man was entirely disabled from doingas a matter of fact any type of work with the left hand." The cause he felt was either a cutting of the nerve or a "basal motive disturbance." However, he frankly stated: "I think purely the stiffness of his fingers was due to inactivity" (Tr-89), and "I felt the man was not doing anything to help himself in the way of rehabilitating the hand, either because the hand hurt him or because he just didn't know how to do it." (Tr-88.)
As to the duration of disability, Dr. Briel stated, Tr-92:
"I don't believe the man will ever have a completely normal hand, I don't think he will ever recover all the lost motion in those fingers. I think he will probably have a certain amount of limitation especially in his ring and little finger. I believe that if this man would begin to do ordinary things and try to forget about his hand I think the mental block would disappear and he would use this hand well enough to do the type of work which he had been doing. I do not know how long it will take him."
Dr. J. J. Stagg, general practitioner, treated plaintiff at the instance of defendant on May 11, 1955, when he incised and drained the pus from the infected and swollen ring finger of the left hand, and saw him again on May 14th, 21st, June 2nd, and June 14th of 1955, on which latter date the finger was healed, although he only had "25 per cent flexion in the finger." He saw him on February 1, 1956, and found the same loss of flexion in the ring finger, and also in the little finger. He stated he could force closure of the ring finger with a little pressure, and from this fact believed that "possibly with exercise he might be able to flex the finger more than he is saying"; and also he could find nothing physically to keep from moving those fingers. (Tr-115.) He admitted he couldn't say plaintiff was faking since "It may be lack of exercise that has got his finger in that position." (Tr-115.) As to percentage disability, he deferred to the opinion of orthopedic specialists, but opined that plaintiff was not totally disabled from performing common labor since "it is not necessary that you have those two fingers to do labor with. A man with those two fingers absent can still carry on a laboring job." (Tr-116.) He thought plaintiff should be able to use a shovel and a crescent wrench or a mop, but that the chief loss was the ability to grasp, the amount of loss in which "would depend on how much strength he *251 would develop in the fingers he is able to use." Tr-117. He further stated, "I would say from the standpoint of disability, he does have a certain amount of disability in his hand as far as his regular work goes." Tr-114.
Plaintiff also introduced the testimony of Leonce Bellow, an experienced garageman, as expert testimony that the two affected fingers are needed in the operation of the small tools necessary for plaintiff to use in the performance of the duties of his occupation as junk dismantler and salesman. Bellow of course did not testify as to the extent plaintiff had lost the use of these two fingerssimply that their use is needed to operate small tools.
We think the testimony of both orthopedic specialists, testifying on behalf of both plaintiff and defendant, proves that plaintiff was totally disabled at least through December 12, 1955, from performance of the duties of his occupation; that the condition of his fingers was improving, although several months continued disability was indicated, at least four to six months from October 4, 1955; and that with reasonable effort on the part of plaintiff to rehabilitate himself, the condition was temporary, and in fact stemmed from disuse as much as from physical cause. The prognosis was either a relief from all disability, or a cure to minor partial disability of the fingers or hand, such as in Blanchard v. Pittsburg-Des Moines Steel Company, 223 La. 577, 66 So.2d 342. The findings of the general practitioner's examination on February 1, 1956, are corroborative of some disability and some improvement.
We are faced with this situation: The original injury was undoubtedly trivial. The prolongation of disability is partially due to disuse on the part of plaintiff. With reasonable effort toward rehabilitation, the disability should according to the uncontradicted testimony of the physicians disappear or be greatly minimized, within a relatively short period which in fact should have expired by the time of the trial.
If plaintiff is entitled to further disability payments under a partial disability of the finger or hand under LSA-R.S. 23:1221(4), the statute provides that from these minimal amounts owing must be deducted amounts previously paid under the permanent or temporary total disability provisions, LSA-R.S. 23:1223.
Usually in cases of temporary total disability, the preferable decree is to award compensation during disability, not to exceed 300 weeks, LSA-R.S. 23:1221(1), Newman v. Zurich General Accident & Liability Insurance Company, La.App. 1 Cir., 87 So.2d 230. But such a decree herein may force defendant to pay compensation long beyond the persistence of this disability originating from trivial injury, even if we reserve to defendant the right to reopen these proceedings immediately rather than waiting for the statutory period of six months from finality of this judgment, which may be done in exceptional cases, see Newman opinion on first hearing. For in the ordinary course of events, with rehearings and applications for certiorari, this opinion will probably not be final sooner than three or four months from now, or about a year beyond the probable duration of total disability.
Therefore, under the very peculiar facts of this particular case, and with very great hesitation, our decree herein will award plaintiff compensation for temporary total compensation disability from April 15, 1955, the date of the accident, through April 4, 1956 (six months from October 4, 1955); reserving to both parties the right to reopen these proceedings at once to prove duration or extent of continuing disability beyond said date.
Plaintiff was paid wages of $30 per week, and furnished free use of a house worth $40 per month rent. The yearly rental of this house therefore is $480, which divided by 52 weeks is a weekly *252 rental of $9.23. There is no evidence as to the value of two or three quarts of raw milk which plaintiff retained daily for his personal use. Plaintiff's weekly wages therefore are computed as $39.23, 65% of which is a weekly compensation rate of $25.50 per week.
For the above and foregoing reasons, the judgment of the District Court herein is reversed, and judgment is rendered in favor of plaintiff, Elza Fontenot, and against defendant, R. L. Myers, awarding plaintiff compensation at the rate of $25.50 per week from April 15, 1955, through April 4, 1956, together with legal interest upon each unpaid installment from date of delinquency until paid; reserving the right to both parties to reopen the proceedings in District Court herein at once to establish any further duration or extent of disability. All costs to be paid by defendant-appellee.
Reversed and rendered.