ELLIS, Judge.
Defendant has appealed from the judgment of the district court awarding plaintiff the maximum rate of compensation per week from February 17, 19S7, for a period not to exceed 300 weeks, under LSA-R.S. 23:1221(1) which provides: “For injury producing temporary total disability to do work of any reasonable character, sixty-five per cent of the wages during the period of disability not beyond three hundred weeks.”
The sole question presented is whether the district court committed manifest error in evaluating of the facts in this case by awarding compensation under LSA-R.S. 23:1221 rather than, as the defendant urged, under LSA-R.S. 23:1222 which provides that “For injury producing temporary total or temporary partial disability the court may, in its discretion, award compensation for a fixed number of weeks to be based on the probable duration of such disability.”
Plaintiff was injured on Feb. 17, 1957 in the course and scope of his employment while unloading some drill collars off of a truck. As we understand the testimony these drill collars were in about six lengths of 41 to 47 feet and weighed approximately 200 pounds per foot. In rolling one of these drill collars plaintiff was backing up and attempting to keep it rolling slowly as it was going down an incline. He stepped in a hole while walking backwards and in attempting to stop it before it rolled over him he placed his left hand against it. The drill collar continued to roll over the left hand bending it back and over the right foot, leg and his body “up to my ribs here.” His fellow employees had to roll the drill collar backward off of him. Fie was immediately sent to the hospital in Eunice where he was under Dr. Stagg’s treatment for five days. He then spent one night at home and went to Dr. Savoy’s hospital in Mamou where he was given traction but left after six days and his testimony was that he could not stand the pain any longer.
As stated by the District Judge in his written reasons for judgment the testimony in the form of depositions of Dr. Savoy and Dr. Stagg as to plaintiff’s present disability are of no assistance, which leaves the case to be decided upon the deposition of the four orthopedic surgeons and *799 the lay testimony. The latter is to he considered when the medical testimony is in conflict.
We have the deposition of Dr. C. V. Hatchette of Lake Charles, La., who examined the plaintiff on behalf of defendant on March 8, 1957, and on August 16, 1957. Also the deposition of Dr. James Gilly of Lafayette, on behalf of defendant who examined the plaintiff on September 30, 1957, and that of Dr. George Briel of Lake Charles, La., who examined plaintiff on August 16, 1957, the same day of the examination by Dr. Hatchette. Also the deposition of Dr. James F. Halley of Baton Rouge, La., who examined plaintiff on behalf of plaintiff of November 29, 1957.
Dr. Hatchette’s testimony given by deposition as to his examination of plaintiff of March 8, 1957, was substantially as follows :
“Mr. Holden had chief complaints at that time of swelling of the left hand, pain in the left chest, constant pain in the low back region, pain and swelling with stiffness of the right ankle, and pain and stiffness of the right knee. * * * He is cooperative in the examination and answers questions alertly. * * * Forwar(j flexion was limited approximately 2-plus, with considerable muscle spasm in the back and limited motions in right and left lateral rotation and extension of the low back region. Straight leg raising was positive on both sides at 135 degrees. The flexed leg tests were normal and the Patrick signs negative. He also complained of sensitivity over the sternum and the anterior chest region and on the left posterior chest cage. It was noted at the time of the examination that the right ankle was moderately swollen and painful over both sides of the ankle, this being principally over the collateral ligaments and the lateral side of the ankle. There were noted abrasions about the right tibia, being located over the tibial spine for a distance of approximately twelve inches. The knee was painful on lateral rotation with the knee flexed at a 90 degree angle. Extension was normal and on further examination of the knee no evidence of internal derangement was noted! * * * X-ray examination of the right ankle, including AP, lateral and oblique views were negative for evidence of bony damage. * * *
“It was my belief following examination that Mr. Holden has a back injury which is confined to the soft tissues of the low back region. This might be described as a rather acute lumbosacral strain at this time. * * * He also has swelling of the right ankle which is the result of the moderately severe sprain of the right ankle. * * * I believe that Mr. Holton has had multiple injuries as the result of the above described accident but that these injuries are not severe in nature and that all are confined to the soft tissues. No bony damage has been found in any other area of the body affected by the injury. No permanent damage is anticipated, in my opinion, and although this man does have rather painful injuries which will require approximately two to three months for full recovery, I feel that he will be able to assume his normal work within that period of time without permanent damage. He should be treated conservatively and, in my belief, will gradually rehabilitate the back and upper parts of the body affected and be physically qualified to assume his normal work in time.”
Dr. Hatchette under cross examination was asked if it was probable or possible that his disability could have extended beyond two or three months as stated in his report of March 8, 1957, and he answered: “Yes, of course it could. This man had multiple injuries and I am sure they were very painful. I felt that these injuries were confined to the soft tissues which would heal within a reasonable length of time, and the two or three months which *800 was designated as the maximum time for improvement was purely a speculative date or rather a speculative time for his complete recovery.”
On August 20, 19S7, Dr. Hatchette testified, and also in his report stated, that plaintiff did not complain of his left wrist or chest on that visit and on that visit appeared to be normal in all respects. He also found excellent motion of the right ankle and concluded that plaintiff on that date was capable of returning to the duties of a “roughneck” and he saw no reason why he should not carry on these duties without discomfort.
The testimony given by Dr. George B. Briel, also a specialist, is in direct conflict with that of Dr. Hatchette, as to the former’s findings and conclusions although he examined plaintiff on August 16, 1957, as did Dr. Hatchette:
“A. I examined his hack and legs at that time. At this time he did not complain of his left arm hurting him. Examination at this time showed a well nourished, well developed white male who sat comfortably in the chair while the history was being taken. He arose from the chair and walked with a slight limp of the right leg. He undressed without difficulty and bent his back in doing so. On standing he showed a rather relaxed posture and tended to favor the right leg. Examination of his back at this time, standing, showed no list of the lumbar vertebrae or tilt of the pelvis. The lordotic curve was within normal limits. A slight left dorsal, right lumbar scoliosis was present with no definite evidence of ky-phosis or rotation being present. There was a slight amount of spasm present in the paravertebral muscles, mostly opposite lumbar one spine. He was able to flex his back until his hands touched his knees when he complained of pain in the region of lumbar one spine. Extension was possible for 25 degrees also with pain at the same point. Lateral bending appeared to he within normal limits but he complained of pain at the extreme of this motion. Rotation was also within normal limits but apparently caused some pain. On forced pressure against the lumbo-sacral region of his back he complained of pain at the region of dorsal 12 and lumbar one spine to which he pointed. With the patient lying on his back on a table hip and knee motions were within normal limits. Bair sacro-iliac test was negative bilaterally. Straight leg raising was possible for 65 degrees on the right with complaint of pain in his back and 70 degrees on the left, also with complaint of pain in his back. When nerve stretch test was done there did not appear to be any pain along the sciatic nerves but he complained of pain in his back. Sciatic nerve tension test was negative bilaterally. It was noted that the hamstring muscles of both thighs were fairly tight. Patrick’s cross leg test appeared to be negative bilaterally. There was no measured leg length discrepancy. The right calf measured 14^4 inches, the left calf 14 inches, in circumference. The right thigh measured 18^ inches, the left thigh 18J4 inches in circumference.
“With the patient lying prone on the table tenderness was present over dorsal spines 12 and lumbar spines one and over the paravertebral muscles to the right of these. Flexion of his knees in this position did not appear to cause any pain or spasm. All reflexes appeared to be present, active and equal. There were no physiological sensory dermatome changes nor were there any motor changes. Examination of his right leg was made with the patient lying on the table. General examination of the leg showed some evidence of what may have been old ecchymoses or bruising over the tibial crest and over the muscles on the lateral side of the leg. There appeared to be some evidence of varicosi *801 ties being present also in the leg. Examination of the right knee showed a slight amount of puffiness around either side of the patellar ligament. The knee was held at 180 degrees extension and there was no rebound tenderness. Motions of the patella were free and no definite crepitation was noted. Stability of the knee appeared to be normal as compared to the other knee. There was no evidence of any tenderness being present around the knee joint. Motions of the knee were from 180 degrees to 40 degrees with a small amount of crepitation noted in the joint. McMurray and Apley tests were essentially negative. The popliteal space was negative. Examination of the right angle and foot showed a slight amount of swelling to be present around the right ankle. All motions of the right ankle were present and normal except for dorsiflex-ion, which was limited approximately 20 to 25 degrees. There did not appear to be any definite areas of tenderness or any pain on these motions. Posture of both feet appeared to be good on standing. There appeared to be some weakness of all the muscles of the lower right leg, but the exten-sor muscles of the foot appeared to be more pronounced.”
Dr. Briel had X-rays made by Dr. War-shaw and found that films of the right ankle were normal, as well as the right knee and those of the lower dorsal spine showed no evidence of fractures, dislocations or abnormalities. The films of the lumbosac-ral spine, as compared to films which were taken on November 24, 1956, showed no appreciable changes.
It was Dr. Briel’s opinion that the plaintiff had suffered a crushing injury of his right leg which had considerably involved the soft tissues of the leg, and also had a contusion of the lower dorsal and upper lumbar region of his back. At this time there was also some question in Dr. Briel’s mind whether the injury to his back was causing some of the disturbance in his right leg or whether the disturbance in his right leg was all due to the trauma of the leg itself, but he thought at the time that the disability of the right leg was due to the trauma to the leg itself and not the plaintiff’s back. The fact that plaintiff still had ecchymoses, which the doctor described as “a bruising and he still showed some evidence of discoloration of the tissues” which indicated a serious bruise, as in most cases the discoloration will clear up in a period of four to eight weeks, depending upon the severity of the injury. Dr. Briel testified that he recommended continuation of exercises for his back and leg condition in order to improve the circulation and to loosen up the muscles. If this did not give plaintiff relief, Dr. Briel suggested that he should have physiotherapy in an attempt to loosen up the right ankle which was very definitely becoming stiff at this time. Dr. Briel was of the opinion that plaintiff was definitely disabled from doing any type of real heavy manual labor as of the date of August 16, 1957.
As to the second examination of plaintiff on September 6, 1957, plaintiff, since his last visit on August 16th, was complaining of pain in his left arm. Plaintiff stated to Dr. Briel that it had been hurt at the time of the accident but had become better and he didn’t think there was anything wrong with his wrist “but lately the wrist had begun to hurt him again.” An examination of his left arm and wrist and hand showed “a very minimal swelling to be present over the radiocarpal joint.” X-rays of the left wrist were made by Dr. Warshaw and “they showed a faint longitudinal linear radiolucency involving the distal shaft of the radius which possibly represents an old incomplete non-displaced fracture. This is well healed at this time. * * * It was my opinion that this man probably had suffered a linear fracture of the distal end of the radius at the time of the accident which had not been recognized and of which he complained at times but which was overshadowed probably by *802 the other things that he had wrong with him and the fracture went ahead and healed. At the present time all I could see was just a mild amount of swelling of the synovial membrane of the radiocarpal joint, which probably represents a mild synovitis (inflammation of the lining of the joint) which is more or less of a chronic inflammatory reaction due to use of the joint.” Dr. Briel did not believe that this would cause plaintiff any real pain at the time he would use it but after he had used it during the day, in. the evening it might cause him some aching due to the use.” Dr. Briel at this examination testified that plaintiff still . showed a mild amount of spasm to be present in the paravertebral muscles opposite lumbar one spine, as well as joint tenderness present over lumbar one spine and over the ligamentous structures between dorsal 12 and lumbar one and between lumbar one and lumbar two spines. The amount of swelling which was present on the first examination on August 16, 1957, in the right leg and ankle appeared to have receded although there was a slight amount present on the second examination. Dr. Briel found slight limitation of motion of the right ankle, which he stated probably caused plaintiff’s complaints which he noted on climbing and squatting.
Dr. Briel thought that plaintiff had approximately 10% disability referrable to his back in relation to his ability to do the type of work he was doing at the time he was injured. He further thought that if plaintiff went back to work at that time he would probably have pain all the time he was working, which he thought at times would be rather severe, depending upon the type of work. For example, he stated that if he had to bend his back considerably, that he would have a lot more pain than if he could stand up straight or do lifting by bending his knees and getting down. When Dr. Briel was asked how long he would suffer pain doing this heavy type of labor he stated, “Of course there is no way that we can tell. This man has been disabled since February and was still apparently having a considerable amount of pain, and it is possible that he probably would have pain for some months if he returned to work or if he didn’t return to work.” He further explained it is very difficult to say how long plaintiff would suffer such pain. He did not think plaintiff was exaggerating his complaints. On cross examination Dr. Briel testified that he found a definite improvement in plaintiff’s leg but he couldn’t see very much difference “as far as the examination of his back was concerned.” He further stated that while he thought plaintiff’s condition was temporary that it was very difficult to say how much permanent injury was done to the muscles of plaintiff’s leg so as to produce this loss of dorsi-flexion, and although plaintiff did show some improvement between the two examinations, he still showed a fair amount of loss of power, and “whether these muscles will return to normal or not you couldn’t say at the time.”
The testimony of Dr. James F. Halley was to the effect that he examined plaintiff on Nov. 29, 1957 at which time he was complaining of pain in the back, right leg, left hand and wrist. From his physical examination and of the X-rays Dr. Halley was of the opinion that plaintiff sustained a lumbosacral strain and contusions of the right leg and foot together with a sprain of the left wrist. The symptoms which Dr. Halley found “pain to pressure over the region of the 12th dorsal vertebra, and to a lesser extent over the entire lumbar .region. Motion in the back was restricted to about 75% of normal because of pain. The straight leg raising tests were bilaterally as positive as well as the Patrick Cross leg tests. These findings together with the negative x-rays for fractures led me to the opinion that the man sustained a strain of this lumbar musculature.”
The District Court in its reasons for judgment stated that Dr. Halley’s deposition was not accurately transcribed and “must be considered along with the stipulation of counsel entered into at the time *803 of oral argument.” In this stipulation Dr. Halley stated that he was of the opinion that plaintiff was still disabled as of the date of the examination but would recover within six to eight weeks.
Dr. Gilly was of the opinion that as of September 30, 1957, the plaintiff was not disabled.
The District Judge concluded: “The fact remains that as of the date of the trial, January 30, 1958, plaintiff was still making the same subjective complaints. Although both of the orthopedic surgeons for the defense are of the opinion that plaintiff had made a full recovery, both of the orthopedic surgeons for the plaintiff were of the opinion that he was still disabled as of the dates of their last examinations. I do not interpret their estimates as to plaintiff's recovery date to be so medically certain as to justify the application of the rule of the Newman case [Newman v. Zurich General Accident & Liability Ins. Co., La.App.,] (87 So.2d 230) cited by defense counsel.”
In addition to the medical testimony plaintiff has offered lay testimony by people who knew him as to his previous ability to work and his inability subsequent to the accident.
Counsel for defendant suggests in his brief that the lower court decided the case after this case had decided Newman v. Zurich General Accident & Liability Ins. Co., La.App., 87 So.2d 230, but, before our decision in the case of Lambert v. American Policy Holders Ins. Co., La. App., 100 So.2d 267, and therefore erroneously resolved the issue on a mistaken impression of the Newman case.
We do not see any difference between the two cases, insofar as their consistency is concerned. As we interpret the judgment of the District Court, he accepted the opinion and findings of Dr. Briel and Halley and rejected the conclusion of Drs. Hatchette and Gilly that there was nothing wrong with the plaintiff as of the date of their last examination, which was prior to the former two doctors’ examinations. The lower court concluded from Drs. Briel and Halley’s finding and conclusions that he could not fix the probable duration of the plaintiff’s disability. Dr. Briel’s last examination was in September 1957, some seven months after the accident and he definitely stated that it would be some months before he thought the plaintiff would be relieved of all disability, and stated that it was very difficult to estimate plaintiff’s duration of disability.
Dr. Halley found the plaintiff disabled as of the time of his examination of November, 1957. The stipulation as to Dr. Halley’s opinion is as follows: “In my opinion, and this being an estimate, since future predictions are always estimates, the duration of this disability would be expected to last for six to eight weeks beyond the date of my examination.”
We find no manifest error in the district court accepting the findings and opinion of Dr. Briel and in rejecting the estimate of six to eight weeks beyond November 1957 as the fixed duration of plaintiff’s disability. The lower court was confronted with the very positive testimony of Dr. Briel and his findings and his apparent inability to place a definite or probable duration, other than “some months”, of disability. “Some months” could mean almost any number. If Dr. Briel thought that the duration of plaintiff’s disability could have been definitely or probably fixed, we find no reason in the record why he would not have so testified. The duration of plaintiff’s disability narrowed itself down to Drs. Briel and Halley and the lower court’s conclusion that he could not fix a probable duration in accordance with LSA-R.S. 23:1222 is not manifestly erroneous.
Counsel for the defendant filed an alternative motion for remand based substantially upon his allegation in the motion that:
“Great injustice will be done defendant in this case if this motion is not allowed *804 for the reason that the ruling of the lower court has placed defendant in the position that if a six months delay from final judgment is required before the case may be reopened, plaintiff will, under the evidence now in the record, be paid compensation for a considerable period longer than his actual disability.”
We have realized the force and logic of counsel’s contention “where the shoe was on the other foot” and see no reason why we should not do so herein. See Newman v. Zurich Gen. Accident and Liability Ins. Co., supra; also Fontenot v. Myers, La.App., 93 So.2d 245, 246, 251. We will therefore amend the judgment of the district court, in that, it is now ordered that the defendant shall have the right to reopen this proceeding upon the finality of this judgment irrespective of the provisions of LSA-R.S. 23:1331, and as thus amended the judgment of the District Court is hereby affirmed.