125 So.2d 419 (1960)
Lillian Marie BOGGS et al., Plaintiff and Appellant,
v.
GREAT ATLANTIC & PACIFIC TEA COMPANY et al., Defendant and Appellee,
v.
FOREMOST DAIRIES, INC., Third-Party Defendant and Appellee.
No. 160.
Court of Appeal of Louisiana, Third Circuit.
December 19, 1960.
Bryan Forrest Gill and Eugene Lawes, by Bryan Forrest Gill, Lake Charles, for plaintiff-appellant.
*420 Anderson, Hall, Raggio & Farrar, by Edgar F. Barnett, Lake Charles, for defendant-appellee.
Cavanaugh, Hickman, Brame & Holt, by Meredith T. Holt, Lake Charles, for third party defendant.
Before FRUGE, CULPEPPER and TATE, JJ.
CULPEPPER, Judge.
In this suit Lillian Marie Boggs, individually, and on behalf of her four minor children, seeks death benefits under the Workmen's Compensation Act as the legal dependents of Laurence Boggs, deceased. From an adverse judgment in the lower court, plaintiff has appealed.
The record in this case shows that Laurence Boggs had been employed by the Great Atlantic & Pacific Tea Company for approximately fourteen years in various capacities, but for several years preceding the date of his injury on November 14, 1958, he was a price marker. In this capacity his duty was to assist in receiving merchandise delivered to the rear of the grocery store building in trucks belonging to other parties. These trucks were unloaded by using long metal rollers to convey the cases of merchandise from the trucks to the loading platform. There is no evidence that Mr. Boggs ever climbed into the trucks, it being his duty to stand on the loading platform and there receive from the rollers the cases of merchandise which he stacked up and subsequently moved into the storeroom of the grocery store by means of a hand truck. Mr. Boggs would then mark the prices on the individual items of merchandise for placement on the shelves of the grocery store. The dairy supplies, such as eggs, butter, cheese, etc., were placed by Boggs in two dairy boxes. The testimony of the various witnesses and the pictures filed in evidence show that all of the compressors and other machinery used to cool these boxes was located on the top, completely out of reach of anyone opening the doors to store or remove dairy products.
A further part of Mr. Boggs' price-marking duties was to change prices. According to the testimony, this was usually done on Mondays and consumed almost that entire day. Mr. Boggs worked five days a week, usually taking off on Saturday, and the evidence is clear that the above were his principal duties as price marker and consumed all of his time.
The evidence also shows that in emergencies Mr. Boggs acted as a checker at the cash registers where customers paid for their purchases. Mary Isaacs, who worked as a checker during this same period of time, testified that Mr. Boggs checked "every once in a while", but she gave no estimate as to the exact number of times per week or per month and stated that his principal duties were those of a price marker. Anna Mae Moss, who also worked as a checker during this same period of time, testified that Mr. Boggs worked in the back of the store as a price marker, and that when they were rushed he would help carry the customers' groceries out of the store to their automobiles, and that he also checked "in an emergency". Mr. James C. Duhon, assistant manager of the store, testified as follows with reference to Mr. Boggs' checking activities:
"Q. In emergencies, Mr. Duhon, did Mr. Boggs help out on the cash register checking? A. Yes, sir.
"Q. How often did he do this? A. Well, sometimes it might be * * * he might help once or twice a week, or maybe sometimes it might be a month that we would have to call him. It wasn't his regular duty.
"Q. When he would be called upon to do anything like that, any checking, how long a time did he have to check? A. Most of the time it was more or less a relief, maybe for others to go to lunch, or if something happened that *421 some of them were short in case they were sick or something."
Mr. Abriam Cormier, the manager of the store, testified that Mr. Boggs'"main job was to price mark in the back room, check in the merchandise and change prices. That was his main duties." With reference to Boggs' checking activities, Mr. Cormier testified, as follows:
"Q. As a part of his regular duties did he operate any cash registers? A. Well, on occasion, yes. He has on occasions.
"Q. Was that part of his regular duties? A. I don't quite get what you mean. Do you mean was it consistent or as the need arose?
"Q. Was that a customary part of his duties? A. If the need would arise, he would be called and he would check but that wasn't his main duty."
Although none of these witnesses could remember ever having seen Mr. Boggs put new detail tape in one of the cash registers, Mr. Cormier stated he felt sure Mr. Boggs, in operating them, must have had occasion to change the tape. Mr. Duhon, the assistant manager, also testified to this effect. There is no evidence that in changing the tape on one of these cash registers, the operator was required to come in contact with any uninsulated electric wires or with the electric motor, or with any other portion of the machine from which he might have received an electrical shock. The operation of the cash register consisted simply of punching the keys thereon to tabulate the cost of the various items of merchandise purchased.
The evidence also shows that there was a coffee grinder located at each checking counter. This machine is approximately three feet long, one foot deep and two and one-half to three feet high, rests on top of the counter, and is used for the purpose of grinding coffee beans to the degree of coarseness requested by the customer. When a customer came to the checking counter with a bag of coffee beans, the checker would open the bag, turn on the machine and pour the coffee in the top thereof. The coffee would pass down through the machine where it was properly ground and then would be caught by the checker in the bag at the bottom of the machine. The motor and grinders and other portions of this machine were entirely enclosed and there is no evidence that the checker had to do anything more than simply turn it on and off. The checkers never cleaned the machines because this was done by another employee of A & P stores who came around periodically for this purpose.
On November 14, 1958, Mr. Boggs was coming into the store through two wooden swinging doors at the rear and was pulling a loaded hand truck. Boggs had his back toward the doors and as he reached them, an employee of third-party defendant, Foremost Dairies, Inc., was coming out of the building pushing a dolly. The milkman's dolly hit the door, which, in turn, struck Mr. Boggs in the back and caused him to be thrown against the handle of the hand truck, which struck Mr. Boggs approximately in the stomach. Boggs was hurt to the extent that he sat down for a few minutes and then went to the rest room where he vomited. Later that same day Mr. Boggs went to see Dr. Russell T. Harris, who specializes in surgery. Dr. Harris found spasm of the abdominal muscles, but no bruises or other evidence of injury. Dr. Harris recommended hospitalization, x-ray and further tests, but Mr. Boggs refused at that time. Mr. Boggs continued to have gastric distress to some extent, although not sufficient to keep him from playing in a dance band the night of his injury, nor to keep him from continuing with his work. On November 17, 1958, Boggs finally went to the hospital where x-ray and other tests were negative as to injury. Mr. Boggs continued working but was seen by Dr. Harris two or three times during the latter part of November and finally Dr. *422 Harris requested that Mr. Boggs return to his family physician, Dr. Price. Approximately one month before the date of the injury, Dr. Price had seen Mr. Boggs for complaints of epigastric distress similar to that which plaintiff was suffering after the injury, but Dr. Price found no palpable mass in the abdomen. It was in December of 1958 that Dr. Price first found a palpable mass which he felt to be a tumor of the pancreas. After that date Mr. Boggs' symptoms continued to worsen and further tests by Dr. Price and Dr. Harris caused them to diagnose a tumor on the head of the pancreas. On January 5, 1959, Dr. Harris performed an exploratory laparotomy which revealed a large malignant tumor on the head of the pancreas which was too widespread for radical surgery. The operation was concluded and Mr. Boggs recovered normally from the surgery but died on June 8, 1959, due to this cancerous condition.
It was the opinion of Dr. Harris that the blow received by Mr. Boggs to his abdomen struck a pre-existing cancer of the pancreas and contributed to its spread and to the speed of its growth, thereby hastening the death of Mr. Boggs by from three to six months. Dr. Holcomb and Dr. Knapp, who were called as witnesses by the defendant, testified that from a reading of the hospital records, reports of Dr. Harris and Dr. Price, and an interview with Dr. Harris, they were of the opinion that this single trauma did not aggravate the pre-existing cancer nor shorten the life of Mr. Boggs.
The lower court decided plaintiff had not sustained her burden of proving a causal relation between the injury and the subsequent death of Mr. Boggs. However, we do not find it necessary to pass on this issue of causal relationship because we have come to the conclusion that Mr. Boggs was not required to perform hazardous duties. The only portions of the decedent's work which plaintiff might possibly contend were hazardous were the truck unloading operations in which Mr. Boggs received merchandise at the end of a conveyor of rollers, carrying groceries out to the customers' automobiles, the storing of products in the dairy boxes which Mr. Boggs also occasionally cleaned and the use of the cash register and coffee grinder when Mr. Boggs was requested, in emergencies, to act as checker.
It is perhaps unnecessary to state that the operation of a retail grocery store is not listed as a hazardous business in LSA-R.S. 23:1035. Cases holding that the operation of a retail grocery store is not hazardous per se are Talbot v. Trinity Universal Ins. Co., La.App. 1 Cir., 1957, 99 So.2d 811, and LeBlanc v. National Food Stores of Louisiana, Inc., La.App. 1 Cir., 1960, 118 So.2d 500. Therefore, the issue to be decided by the court is whether the duties performed by Mr. Boggs were such as to render his employment hazardous within the contemplation of the Workmen's Compensation Act.
Plaintiff contends that Mr. Boggs performed hazardous duties in "unloading trucks" and occasionally carrying packages out to customers' automobiles. A case in point is Fields v. General Casualty Co. of America, La.App. 1 Cir., 1948, 36 So.2d 843, where the plaintiff actually loaded sacks of seed, feed, fertilizer, etc., onto the trucks of the customers and the court held the mere fact that his duties required him to come in contract with motor vehicles of third parties did not cause his employment to be hazardous. The case of Hammer v. Lazarone, La.App. 2 Cir., 1956, 87 So.2d 765, held that a car hop at a drive-in restaurant was not engaged in hazardous employment although he worked in proximity to the automobiles driven by patrons into the drive-in restaurant. Other cases following this same holding are Coleman v. Sears, Roebuck & Co., La.App., 83 So.2d 469; and Horton v. Western Union Telegraph Co., La.App., 200 So. 44.
Regarding plaintiff's contention that Boggs' duties with reference to the dairy boxes were hazardous, the evidence shows that all Boggs had to do was open and close *423 the door to either store or remove dairy products and that he occasionally cleaned these boxes. The compressors and machinery were all located on top of the boxes completely out of reach. There are at least two cases from our courts of appeal holding such duties with reference to electric refrigerators to be non-hazardous. Claiborne v. Smith et al., La.App. Orleans, 1941, 2 So. 2d 714; Hymel v. Employers Liability Assurance Corp., Ltd., of Great Britain, La. App. 2 Cir., 1959, 113 So.2d 481.
Plaintiff next alleges that the decedent's occasional operation of a cash register and coffee-grinding machine constituted hazardous duties. We do not want it understood we are of the opinion that the use of the cash register or the coffee grinding machine which contained small enclosed electric motors is sufficient to classify Mr. Boggs' employment as hazardous, but even admitting, for the sake of argument, that these duties were hazardous, they did not constitute a sufficiently substantial portion of his work to warrant coverage by the workmen's compensation law. In the pocket part to Malone's Workmen's Compensation Law and Practice, Sec. 101, page 25, we find the following discussion of this concept which requires that the hazardous duties constitute a substantial portion of the employee's work:
"101. Partially Hazardous EmploymentsClaimant Injured While Doing Nonhazardous Work.
"The unwillingness of the Louisiana courts to apply the doctrine of Byas v. Bentley [157 La. 1030, 103 So. 303] where the hazardous work is only a small part of the employment was first indicated in Brownfield v. Southern Amusement Co. (discussed in the Text). A more recent case follows the Brownfield decision. Claimant, a maid in defendant's store, used an electric steam iron and vacuum cleaner on occasions. She was injured at a time when she was not using either of these implements. Compensation was denied. Following the Brownfield decision, the court observed: `If the interpretation of the Workmen's Compensation Act can be extended beyond the extremely liberal interpretation given to it in the case of Byas v. Hotel Bentley, there would be no such thing as an employment not covered by the provision of the statute'.
"A similar decision, relying upon the Brownfield case is Hammer v. Lazarone. Also, in Talbot v. Trinity Universal Ins. Co. compensation was awarded the manager of a grocery store who also assisted in the meat department and operated a grinder, although at the time of accident he was not engaged in hazardous work. The court made clear that the right to recovery depended upon the fact that plaintiff was regularly and as daily matter required to actually use and operate the grinding machinery."
In the case of Brownfield v. Southern Amusement Co., Inc. et al., 1940, 196 La. 73, 74, 198 So. 656, 660, plaintiff was the manager and cashier of a small theater. Her duties required that she spend all of her time in the theater with the exception of a few hours each week when she used her own automobile to inspect signs and billboards in the vicinity and, occasionally, when films were not promptly received in Mansfield, Louisiana, she would drive to Shreveport, Louisiana, to obtain them or a substitute therefor. Her principal duties were of a clerical nature and she also sold and took up tickets and supervised the showing of pictures in the theater. She was injured when she fell from the tall stool at the cashier's window and broke her arm. The court held, as follows:
"Plaintiff's work was essentially of a non-hazardous character. The mere occasional use by her of her automobile to facilitate her in the performance of a very small part of her work did not take it out of that characterization. *424 Byas vs. Hotel Bentley, supra, represents the uttermost extent to which the doctrine should be made to apply."
This same concept was followed in the case of Harrington v. Franklin's Stores, Corp. of New Iberia, La.App. 1 Cir., 1950, 55 So.2d 647, 650, in which the plaintiff was employed as a maid and her principal duties consisted of general cleaning of the store, but her duties also included the use of an electrically powered steam iron to press merchandise for display in the window and the use of an electrically powered vacuum cleaner. The court held, as follows:
"In the present case there is no doubt as to what was necessary to be done by the plaintiff when she used both the electric steam iron and the vacuum cleaner. She was required merely to plug in the appliances and there is no showing in the petition that the use of these implements was any more hazardous than the devices used daily in any modern homes and, above all, we do not find the operation of the iron and vacuum cleaner to have been a substantial or integral part of the defendant's business."
In the case of Brown v. Toler, La.App. 1 Cir., 1944, 19 So.2d 680, 682, where there was testimony by the plaintiff alone that once or twice a day he fed a sausage grinder and also cleaned the grinder and a coffee mill, the court considered the question of whether this was a substantial part of his employment and held, as follows:
"Our conclusion is that plaintiff has failed to prove with legal certainty that part of his duties required him to operate and clean the meat grinder, and in any event, if he did occasionally feed and clean this small meat grinder, that this was a major and material part of his employment so as to make it hazardous within the meaning of the law."
In the case of Guidry v. New Amsterdam Casualty Co., D.C.1956, 148 F.Supp. 248, 250, the plaintiff, a nurse's aid in a hospital, was occasionally required to operate a dumb waiter. Judge Christenberry of the United States District Court for the Eastern Division of Louisiana expressed this concept, as follows:
"Where an employee performs services in both the hazardous and the non-hazardous features of his employer's business and is injured while performing services in the latter category, he is entitled to compensation, provided the employee's connection with the hazardous features of the employer's business is a major or material portion of his duties and not merely occasional. Byas v. Hotel Bentley, Inc., 1925, 157 La. 1030, 103 So. 303; Brownfield v. Southern Amusement Company, Inc., supra."
In the recent case of Luce v. New Hotel Monteleone, 1958, 234 La. 1075, 102 So.2d 461, 463, our Supreme Court again acknowledged this rule of law where the plaintiff as an inspectress was required frequently every day to travel from floor to floor in the hotel by means of an electrically powered freight elevator and she was actually injured while alighting therefrom. The court used the following language:
"It is now well settled that an employee is covered where he is regularly exposed to or is frequently brought in contact with the hazardous feature of a business, even though he is primarily engaged in the non-hazardous part * * * indisputably, the duties of this plaintiff required that she frequently come in contact with and be regularly exposed to a hazardous phase of her employer's businessthe maintenance and operation of a freight elevator. Consequently, under the mentioned existing jurisprudence of this State she is covered by the provisions of the workmen's compensation law." (Emphasis supplied.)
*425 Incidentally, it is interesting to note that in the Luce case, our Supreme Court approved the holding of the First Circuit Court of Appeal in Harrington v. Franklin's Stores Corporation, supra, that the use of an electrically powered vacuum cleaner and steam iron was not hazardous. The Supreme Court used this language:
"The decisions cited in support of the defense urged herein are all from Courts of Appeal. And in only one of them was the writ of certiorari applied for, it being Harrington v. Franklin's Stores Corporation of New Iberia, La.App., 55 So. (2d) 647. But there the sole issue was whether the appliances used by the plaintiff in connection with her duties (a vacuum cleaner and an electrically powered steam iron) were sufficient to render the employer's business amenable to the provisions of the compensation statute. The Court of Appeal held that they were not, being only such instrumentalities as might be found in most up-to-date homes. The decision, hence, is unapplicable here."
In Fontenot v. Myers, La.App. 1 Cir., 1957, 93 So.2d 245, 247, the Court held:
"Brownfield v. Southern Amusement Co., 196 La. 73, 198 So. 656, simply holds that occasional performance of hazardous duties by one employed in a non-hazardous business does not render compensable an accident sustained in the performance of non-hazardous duties."
"Thus, in the present case, if Fontenot had been employed solely to perform duties in connection with the cattle business, an accident while at work thereat would not have been compensable just because the employer also maintained the hazardous business of a junk yard or just because Fontenot occasionally had performed duties in connection with this other and hazardous business."
In the case of Richardson v. American Employers Ins. Co., La.App. 1 Cir., 1947, 31 So.2d 527, 530, the plaintiff was an employee at a drive-in restaurant who occasionally oiled, plugged in and generally took care of suction fans and five electrical motors in the restaurant, and the court held, as follows:
"However, conceding that these fans and electrical motors come within the purview of the acts so as to make it hazardous within the purview of the law, yet the evidence shows that the services performed by plaintiff occupied very little of plaintiff's time and were merely incidental and were not a major and material part of plaintiff's employment but merely incidental thereto. See Brown v. Toler, La.App., 19 So. (2d) 680."
The facts of the instant case show that Mr. Boggs was employed as a price marker, but occasionally, in emergencies, he acted as a checker and in so doing used the cash register and the coffee grinder. He did this at the most once or twice a week and sometimes not for a month at a time. Under the jurisprudence set forth above, this clearly was not a sufficiently substantial portion of his duties to bring him within the coverage of the Workmen's Compensation Act.
Having concluded that Mr. Boggs' employment was not covered by the workmen's compensation law, it is unnecessary for us to pass on the issues of negligence and contributory negligence between the defendant, Great Atlantic & Pacific Tea Company, and the third-party defendant, Foremost Dairies, Inc. It is, furthermore unnecessary for us to pass on the question of whether Foremost Dairies, Inc., has been properly brought within the jurisdiction of this Court of Appeal by reason of the fact that Great Atlantic & Pacific Tea Company simply answered the plaintiff's appeal but did not file an appeal as to that portion of the lower court's judgment *426 which dismissed the action against Foremost Dairies, Inc.
For the reasons hereinabove set forth, the judgment appealed from is affirmed. All costs of this appeal are assessed against the plaintiff.
Affirmed.