175 So.2d 277

Sam RICHARD

v.

UNITED STATES FIDELITY & GUAR-
ANTY COMPANY and Landre-
neau Enterprises, et al.

No. 47547.

May 3, 1965.

Rehearing Denied June 7, 1965.

Preston N. Aucoin, Ville Platte, Daniel J. McGee, Mamou, for plaintiff-appellee-applicant.

Gist, Gist, Methvin & Trimble, by De-Witt T. Methvin, Jr., Alexandria, Donald Soileau, Mamou, for defendants-appellants-respondents.

HAMLIN, Justice:

In the exercise of our supervisory jurisdiction (Art. VII, Sec. 11, La.Const. of 1921, LSA), we directed certiorari to the Court of Appeal, Third Circuit, in order that we might review its judgments in the cases of Richard v. Landreneau Enterprises, Et Al., and Richard v. United States Fidelity & Guaranty Company, which reversed the judgments of the trial court rendered in favor of plaintiff. La.App., 167 So.2d 827; La.App., 167 So.2d 840; 247 La. 254, 170 So.2d 510. The cases were consolidated for trial and appeal, but separate judgments were rendered. Certiorari having been granted at the instance of plaintiff-relator, the matter has been consolidated in this Court and one judgment will be rendered herein.

This matter involves workmen's compensation. Sam Richard filed suit against United States Fidelity & Guaranty Company, in which he alleged that while in the course and scope of his employment with Landreneau Enterprises, Adraste Landreneau Gins, Inc., and/or the Estate of Adraste Landreneau, on November 19, 1962, he suffered a myocardial infarction (heart attack) with superimposed pneumonitis, as well as a stroke, from which he became permanently and totally disabled. Plaintiff further alleged that he was informed and believed that the defendant had insured his employers and that the insurance covered the alleged liability. By supplemental and amending petition, plaintiff alleged that the policy sued upon erroneously and through inadvertence named only Adraste Landreneau Gins, Inc. as insured, whereas, it was the true intention of the parties that the policy should cover the employees of Landreneau Enterprises, Adraste Landreneau Gins, Inc., and the Estate of Adraste Landreneau; he prayed for reformation of the policy.

The defendant insurer denied liability and filed a Third Party Complaint against Adraste Landreneau Gins, Inc. It alleged that the policy of workmen's compensation insurance it had issued to Adraste Landreneau Gins, Inc. did not cover the work being performed by plaintiff at the time he suffered his heart attack.

Landreneau Enterprises, Semantha Vidrine, Widow of Adraste Landreneau, Joseph Gibbons Landreneau, Louis Calvin Landreneau, Charles Edward Landreneau, Annabelle Landreneau, and Adraste Landreneau Gins, Inc. denied the allegations of the Third Party Complaint.

After filing the above suit, Sam Richard filed a workmen's compensation suit against Landreneau Enterprises, Adraste Landreneau Gins, Inc., and the Succession of Adraste Landreneau. He alleged the accident, supra, and made a demand against the defendants for total disability, penalties and attorney's fees, and medical expenses, said demands being the same as those prayed for in his suit against the insurer.

These defendants denied liability and filed a Third Party Complaint against United States Fidelity & Guaranty Company. They alleged that they were insured by United States Fidelity & Guaranty Company on and prior to the date of plaintiff's alleged accident, against liability to their employees, including Sam Richard, under the provisions of the Louisiana Workmen's Compensation Laws, and that this insurance was in full force and effect when Richard was injured. The third party defendant prayed for rejection of the third party plaintiffs' demands.

For a complete understanding of this matter, we repeat the following facts correctly found by the Court of Appeal:

"* * * we start with the business activities of Mr. Adraste Landreneau before his death in 1960. He was engaged in several businesses in and around the town of Mamou, Louisiana. He owned two cotton gins, as an incident to which he sold cottonseed, fertilizer and insecticides and also financed farmers; he owned a farm with about fifteen tenant houses for individuals who farmed the land on a sharecrop basis; he raised cattle; he operated a rice irrigation well; he owned an insurance agency; he also owned four or five rent houses in the town of Mamou.

"Mr. Adraste Landreneau died on July 13, 1960 leaving a widow and four children. His succession was opened on July 18, 1960 and his two sons, Mr. Louis Calvin Landreneau and Mr. Joseph Gibbons Landreneau, were appointed co-administrators. These administrators managed the various interests of the estate until the heirs were placed in possession by judgment dated March 24, 1961. Then the heirs decided they would separate the cotton gin from the remaining business interests. Accordingly, as of January 1, 1962, a corporation was formed under the name 'Adraste Landreneau Gins, Inc.' The two gins, as well as the cottonseed, fertilizer, insecticide and farm financing businesses, were transferred to this corporation which was wholly owned by the heirs. On or about the same date the widow and heirs also formed a partnership known as 'Landreneau Enterprises' for the operation of the remaining interests of the estate, including the farm properties and the rental properties in town. Separate sets of books and separate bank accounts were created for the corporation and the partnership.

"Shortly after Mr. Adraste Landreneau's death, the co-administrators had employed the plaintiff, Mr. Sam Richard. He was hired primarily to operate one of the gins during the ginning

season. When his services were not needed for this purpose he worked for the estate (later the partnership) or for one of the heirs individually. Usually plaintiff worked full time at the gin from August through October and then, during November and December when the season was 'winding up,' he worked only one or two days a week at the gin. When plaintiff worked at the gin he was paid by the gin corporation. When not working at the gin, he was paid respectively by the individual heir or the partnership for whom the work was done. Most of plaintiff's off-season work was at a feed and seed store owned and operated by Mr. Calvin Landreneau individually. He also occasionally did work as a general handyman for the partnership. He maintained the irrigation well and had done repair and maintenance work on the rent houses in town and on the farm."

The Landreneau Estate owned a mortgage on a dilapidated house and a lot located in the town of Mamou, which property was turned over to the Estate by the mortgagor. The Estate also owned another dilapidated house which had belonged to the Landreneau grandmother. The Estate employed Marcel Guillory as foreman to oversee the tearing down of these two houses and, from the same lumber, the reconstruction of one house on one of the lots; Guillory was paid by the Landreneau Enterprises. The reconstruction was the first in which the Landreneaus had engaged. They owned four other houses in Mamou; two were rented for cash, one was occupied by a Landreneau, and the other was occupied by a farm manager. Plaintiff Sam Richard worked at the gin on November 17, 1962. On November 19, 1962, he worked as a carpenter's helper on the reconstruction project and suffered his heart attack while performing carpentry work; he thereafter instituted the two proceedings supra.

At the time plaintiff suffered his heart attack, the Landreneaus carried workmen's compensation insurance with United States Fidelity & Guaranty Company. The policy was an alleged renewal of the insurance carried by the deceased Adraste Landreneau. The policy recited that it expired on July 3, 1963, and the name of the insured was listed as "Adraste Landreneau Gins, Inc., Mamou, Louisiana." (The previous policy, which expired July 2, 1962, named the insured as "Landreneau Gin.") The declarations on the back of the policy recited, under Locations, "2 Gins-Mamou, Louisiana." The following appeared under classification of Operations:

| "Premium Basis Estimated Total Annual Remuneration | Rates Per $100 of Remuneration | Estimated Annual Premiums |
|---|---|---|
| "Cotton Gin Operation including local manager, drivers     $12,300 | 9.09 | 1118.07 |
| "Farms—all employees other than inservants— including drivers     1,200 | 5.56 | 66.72" |

Adraste Landreneau desired to increase his coverage while he was alive; the following is a file memorandum of the insurer with respect thereto:

"Alexandria, La.,
"6–18–58

"File Memorandum: Adraste Landreneau.

"Mr. Landreneau telephoned this afternoon that he had received our letter with which we had enclosed renewal workmen's compensation and general liability policy covering his gin at Mamou. He has requested that we extend this policy to also cover employees on his farm. He has approximately 15 or 16 tenant dwellings and the farm is operated on a share crop basis, which he referred to as a 1/3 basis. He is interested in having labor covered under our compensation policy, which performs maintenance work on the tenant dwellings and other property, such as barns, fencing, etc.

He states that he would estimate the payroll for these maintenance employees to be approximately $1,000 a year. We should add to our policy by endorsement as of its effective date, as well as the current policy which has not yet expired, the classification of Farms with an 'If any' payroll, and also the classification of Residence Carpentry, unless the latter classification carries a lower rate than for farms, in which event we should only show a farm classification and rate.

"He stated that he was mailing to us today the General Liability Policy which we asked be returned for cancellation."

Having the above facts before it, the trial court found that there was a causal relationship between the plaintiff's heart attack and the work in which he was engaged when he suffered the attack. It further found that it was part of the business of plaintiff's employer to repair houses; that

plaintiff suffered his heart attack while working for his employer and that said employment was a part of the business, trade, and occupation of the employer. The court stated that the serious question presented to it was whether or not the policy of insurance upon which the suit was brought afforded coverage to the Landreneau Enterprises, the alleged employer of the plaintiff. In answering the question affirmatively and ordering the reformation of the instant policy, the trial court stated:

"The testimony on that score is that upon the death of Mr. Landreneau, the heirs, for bookkeeping purposes only, formed a corporation and called it 'Landreneau Enterprises.' This corporation was intended to, for bookkeeping purposes only, be distinguished from the gin operations of the heirs. The premiums paid for this policy, which the defendant claims did not cover the Landreneau Enterprises, were based by the auditors of the defendant upon the same number of employees and also it was apparently intended to cover all of the operations of the heirs of Mr. Adraste Landreneau. This is brought out clearly from the testimony of the defendant's agent, Mr. Bolton.

"The jurisprudence clearly authorizes the courts to reform insurance contracts where there exist some mutual mistakes by both the issuing company and the insured.

"For that reason, the Court holds that the defendant, United States Fidelity & Guaranty Company, did cover the Landreneau Enterprises, as well as the other designated enterprises in the policy."

The trial court rendered judgment in favor of plaintiff, Sam Richard, and against the defendant, United States Fidelity & Guaranty Company, for total disability ($35.00 per week for 400 weeks) and medical expenses; it denied penalties and attorney's fees. In the matter of Sam Richard vs. Landreneau Enterprises, Et Al., the court rendered judgment in favor of plaintiff for total disability and medical expenses; it denied penalties and attorney's fees. The court stated in both judgments that satisfaction of the judgment in one suit would satisfy the judgment in the other suit. It further stated that it was its intention to render only one solidary judgment against all defendants in both suits.

All defendants appealed from the above judgments.

The Court of Appeal found that, "From all of the evidence we think the only reasonable and fair conclusion is that the strenuous physical work being done by plaintiff was the immediate precipitating cause of this heart attack." The Court said it would next consider whether the construc-

tion of the rent house[1] was a part of the regular trade, business or occupation of the employer within the meaning of LSA–R.S. 23:1035; it stated:

" * * * But here, the repair of these few rent houses was not so recurrent as to require a regular maintenance crew. The Landreneaus did not have a regular maintenance or construction crew. For this particular job the partnership had hired two or three carpenters, and plaintiff as a carpenter's helper, on a purely casual basis. * * *

" * * * it is apparent that the Landreneaus' business of renting these four or five houses in the town of Mamou was non-hazardous and the demolition or construction of such houses was not a regular part of the Landreneaus' rental business."

The Court of Appeal found that the services being performed by plaintiff at the time of his heart attack did not arise out of, nor were they incidental to, his work for the gin corporation; it concluded that neither Landreneau Enterprises, nor Adraste Landreneau Gins, Inc., nor the Estate of Adraste Landreneau was liable to plaintiff for workmen's compensation benefits.

With respect to the insurer, the Court of Appeal found that the estoppel set forth in LSA–R.S. 23:1166 did not apply. It stated that in reality the insurer raised the defense that the construction of a rent house was not a regular part of the business of renting houses. On the basis of its prior findings, the Court rejected plaintiff's claim against the insurer. The Court of Appeal made no determination, however, as to whether Adraste Landreneau Gins, Inc., Landreneau Enterprises, and/or the Estate of Adraste Landreneau were all covered by the instant policy; it stated that there was no need to make a finding because the insurer was not estopped to deny liability under LSA–R.S. 23:1166.

Plaintiff-relator, Sam Richard, assigns the following errors to the judgments of the majority of the Court of Appeal:[2]

1. The majority of the Court of Appeal erred in failing to apply Section 1166 of the Workmen's Compensation Act and thereby in not holding that a workmen's compensation insurer is prohibited from asserting non-hazardousness of employment.

2. The majority of the Court of Appeal erred in holding that the repair or construction of a rent building housing a non-hazardous business is not a regular part of the trade, business, or occupation of the employer.

1. The evidence reflects that the reconstructed house was rented at the time of trial.

2. Judge Albert Tate dissented from the opinions and judgments of the majority of the Court of Appeal.

3. The majority of the Court of Appeal erred in holding that a workmen's compensation insurer may properly base its defense on the ground of non-hazardousness of the employment and therefore urge that it was not a part of trade, business, or occupation of the insured employer.

4. The majority of the Court of Appeal erred in failing to apply the rule that when a substantial part of the employee's regular duties with the same employer is hazardous the employee is covered while performing work for the employer which might otherwise be considered non-hazardous, especially here, where the employee's work at the time of the accident is itself specifically listed as hazardous, or covered.

5. The majority of the Court of Appeal erred in holding that a rule or principles peculiar to situations involving different employment by different employees on different periods must be applied to a worker who is hired by a single employer to work in various aspects of that employer's business on a full-time basis and where the single employer directs the employee to work on different aspects of his business from day-to-day and even hour-to-hour.

6. The majority of the Court of Appeal erred in ruling that although the workmen's employment at the time of the accident is specifically listed as hazardous in the workmen's compensation law, the employee is not covered if the hazardous work is being performed on a structure which houses a non-hazardous business of the employer.

7. The majority of the Court of Appeal erred in holding that although an employer pays over $1,000.00 of wages annually in repairing his rent buildings, the repair activities are not a substantial or recurring business activity.

8. The majority of the Court of Appeal erred in not holding that an employee who is ordered by his employer to do a certain work during his regular work day is covered under the compensation act even though the particular work the employee is directed to do may not be strictly a part of the employer's trade or business.

■ As stated supra, both the trial court and the Court of Appeal found that there was a causal connection between the work stress placed on plaintiff and his resulting injury. We agree with the findings and conclude that an accident occurred while plaintiff was performing hazardous work, as a result of which he was permanently and totally disabled. As a result of the injury, plaintiff incurred sizeable medical bills.

■ Adraste Landreneau, as stated supra, owned all of the Landreneau endeavors at the time of his death and operated as a

sole proprietor. There is evidence of record that previous to his death he was in the process of incorporating, but the process was not completed. His wife and children began to break down the numerous Landreneau businesses and occupations into separate categories in 1962, for the purpose of taxation and bookkeeping; in other words, their accounting was facilitated. At the time plaintiff suffered his accident, the Landreneaus (other than what was reflected on their books) were operating in the same fashion as had Adraste Landreneau. In brief, counsel for the Landreneaus state that the policy issued by the United States Fidelity & Guaranty Company covered all of the business and/or ventures of "The Landreneaus" and "there was in fact no division of the business." We are therefore constrained to conclude that Landreneau Enterprises was not carrying on a separate rental business; whatever rental business existed was a part of all the Landreneau endeavors. It follows that at the time of his accident plaintiff was not working for just one phase of the Landreneau businesses, but that he was working for Landreneau Enterprises, Adraste Landreneau Gins, Inc., and/or the Estate of Adraste Landreneau. This conclusion is substantiated by the following pertinent testimony of Louis Calvin Landreneau, General Manager of Landreneau Enterprises, President of Adraste Landreneau Gins, Inc., and Co-Administrator of the Estate of Adraste Landreneau:[3]

"Q. Alright, now did the creation of this corporation and the creation of this partnership change in any way the activities being conducted by you and your brothers, and sisters and your mother, in other words the heirs of Adraste Landreneau, in other words was there any change in the activities being performed and by that I do not mean maybe bookkeeping or anything else, but in the work for example the cattle raising, the farming, the fertilizer and so forth, ginning?

"A. No, there was no difference.

"Q. Isn't it true that the reason for forming the corporation and the partnership was for ease of administration only, and that there was no change in the business ever since prior to your father dying really, it has all been conducted pretty much on the same basis without any major upheavals?

"A. That's correct.

\*    \*    \*    \*    \*    \*

---

3. Louis Calvin Landreneau's testimony is not contradicted and is supported by that of other witnesses.

"Q. Now who was Sam Richard working for on the day he was injured on November 19, 1962, and by that I mean was he working for the Estate as an estate, was he working for the partnership as a partnership, that would be Landreneau Enterprises, was he working for the gin corporation as a corporation?

"A. Well he was working for the Estate, of course he was paid with an Enterprise check which we use more or less for bookkeeping records.

"Q. Now Sam testified, as you heard, that the Saturday before the Monday that he was hurt he was working at the gin, ginning some bales of cotton because it was in the off season and the gins were running, I mean it was in the slack season at the end of the ginning season, and the gins were running only on Saturday, now in the case of an employee who would work such as Sam did, from Monday through Friday at odd jobs possibly anywhere else away from the gins, then would work at the gins on the Saturday, how would he be paid, by what, out of what account?

"A. Well chances are he was paid, I wouldn't recall exactly but chances are he was paid at the gin because we have a gin account, a bank account for each gin, and we have a bank account for the gins incorporated, the reason for that is for bookkeeping records only.

"Q. And another good reason for that isn't it the fact that rather than having all of your employees leave there and go to the office up town, leave the gins and go to the office up town to get their checks, it's easier to pay them right there where when—in other words the account is set up so that the farmer when his bale is ginned and weighed and so forth he can get paid right there at the gin without having to go to your office?

"A. Oh that's correct, and you see we have an account for each gin individually, we buy and sell our cotton and seed and we pay our employees and pay our expenses from that Gin No. 1 account or the Mamou Gin account and that's just for that season and then after the season we know just how each gin came out, an approximation.

"Q. And that is a matter of convenience only, the fact that they can just as easily be paid through the downtown office?

"A. Well we do pay sometimes at the down-town office, especially during the repair season or even at the end of the season, in this particular case of Sam, his last check, at the end of the season he could have possibly been paid at the office.

"Q. Or at the gin because this was on a one day a week basis, so it could have been at either place?

"A. That's right.

\*     \*     \*     \*     \*     \*

"Q. Now Mr. Landreneau, have you ever been discharged from this administration?

"A. Not that I know of.

\*     \*     \*     \*     \*     \*

"Q. Mr. Landreneau, there seems to be some confusion in your testimony or uncertainty in your testimony on this one point, and I ask you to reflect upon this question and then give me an answer, isn't it a fact that there has been no properties conveyed to Landreneau Enterprises by the individual owners who are the heirs?

"A. No, there's no—no property has been transferred to the Enterprises as yet.

"Q. A partnership has been formed among the heirs of Adraste Landreneau with possibly an idea of transferring these properties to it, but this has not been done?

"A. That's correct.

\*     \*     \*     \*     \*     \*

"Q. But I mean sometimes your employees are working for what you call the estate and other times the same employees are working for the enterprises and they still get paid as though they were working for only one. In other words, one of your men might be working for say three (3) days for Landreneau Enterprises and two (2) days for the Estate of Landreneau, but when he draws his pay check it may be given on Landreneau Enterprises, isn't that correct?

"A. Well anytime the Estate and Enterprises—right, that's how we figure it. The reason we do that for Enterprises any time he works on the farm or anything like that, we give a check from the Enterprises, like I said for bookkeeping records.

\*     \*     \*     \*     \*     \*

"Q. Mr. Landreneau, for further clarification, isn't it a fact that if Adraste Landreneau Gins, Inc. had not been formed, if Landreneau Enterprises, the partnership,

had not been formed, and you were still operating just as either in the estate or in co-ownership among all of the heirs of Adraste Landreneau that this wouldn't have affected anything in the work that you were doing and your employees, the amount of their pay or anything else with the exception of the bookkeeping involved, insofar as you are concerned, is that correct?

"A. That's correct, that's what our intentions were, to keep operating the same as always.

"Q. To your knowledge, was it ever the intention of you or of anybody else, any of the other heirs of the Estate of Adraste Landreneau, to change whatever workmen's compensation insurance coverage there was and limit it only to the gin operation?

"A. Definitely not.

\* \* \* \* \* \*

"Q. \* \* \* Mr. Richard did not work for your father, did he?

"A. No, Mr. Richard did not work for us at the time of his death.

"Q. He hadn't worked for him for several years before your father died, had he?

"A. Right.

"Q. And then after your father died, you employed Mr. Richard primarily to help with the Gins, did you not?

"A. That's correct.

"Q. And when he was not working at the Gins, during the off-season, he would work elsewhere, is that correct, I mean away from the Gins?

"A. That's right, that was the understanding, when he came to work for us that he had to have full employment, not just during the season, so we gave him full employment through the year, in fact \* \* \*

"Q. Sometimes he would work for you in your individual store down there, would he not?

"A. During the winter months he'd work in the store for me, personally.

"Q. In other words, your understanding was that either the Landreneau Gins would keep him employed or some member or organization which the Landreneaus owned or controlled, would employ him, or they would see to it that he had employment during the off-season, is that correct?

"A. Correct.

  \*   \*   \*   \*   \*   \*

"Q. But your primary interest was that during the off-season of the Gins, that he would have employment?

"A. That's right."

The record is replete to the effect that many of the business phases of the endeavors of "The Landreneaus", which we have heretofore found were not divided at the time of the instant accident, were hazardous. The record is also replete to the effect that plaintiff performed many hazardous duties for his employers (Landreneau Enterprises, Adraste Landreneau Gins, Inc., and/or the Estate of Adraste Landreneau) and was exposed to and frequently brought into contact with the hazardous features of his employers' business. The record also substantiates the finding of the trial judge that "whether or not the house upon which Mr. Richard was working at the time of the accident was part of the farming operations, certainly it was part of the business of his employer to repair houses."

Our jurisprudence has held that the rental of houses may not of itself be a hazardous business, but if the employer's business has hazardous features, the non-hazardous phase does not preclude amenability to the provisions of the Workmen's Compensation Law. Cf. Luce v. New Hotel Monteleone, 234 La. 1075, 102 So.2d 461. It is now well settled that an employee is covered where he is regularly exposed to or is frequently brought in contact with the hazardous feature of the business, even though he is primarily engaged in the non-hazardous part. Luce v. New Hotel Monteleone, supra. Also, if one is engaged in both hazardous and non-hazardous branches of his employer's business, and his employment is one employment, it is immaterial whether his non-hazardous duties constituted his major employment to which his hazardous duties were merely incidental, or vice versa; the important fact is that the employee was injured while actually engaged in performing duties, whether main or incidental, called for by his employment. Byas v. Hotel Bentley, Inc., 157 La. 1030, 103 So. 303. If the operator of an admittedly hazardous business, in the conduct of that business undertakes repair, whether it be of the building housing the same or the equipment therein, rather than have it done under contract, his employees come under the protection of the employers' liability laws of this State. Speed v. Page, 222 La. 529, 62 So.2d 824.

Our findings and the jurisprudence cited, supra, compel us to conclude that the accident suffered by plaintiff in the instant case was within the purview of the Workmen's Compensation Act, LSA–R.S. 23:-1021–1166, and that plaintiff was covered by

the provisions of the statute. He is therefore entitled to recover workmen's compensation and medical benefits from his employers, Landreneau Enterprises, Adraste Landreneau Gins, Inc., and/or the Estate of Adraste Landreneau. Cf. Landry v. Fuselier, 230 La. 27, 88 So.2d 218; Boggs v. Great Atlantic & Pacific Tea Company, La.App., 125 So.2d 419; Allen v. Travelers Insurance Company, La.App., 124 So.2d 367, 165 So.2d 589; Richmond v. Weiss & Goldring, La.App., 124 So.2d 601; Costanzo v. Southern Farm Bureau Casualty Ins. Co., La.App., 124 So.2d 621; Effler v. Edwards, La.App., 142 So.2d 599; Edwards v. Stafford, La.App., 153 So.2d 106; 19 La.L.Rev. 341; 11 Loyola L.Rev. 278.

The final question presented for our determination is whether the instant insurance policy covered plaintiff's employers and the employment performed by plaintiff at the time he suffered his heart attack.

■ The evidence of record affirmatively reflects that all of the Landreneaus thought that they were renewing, and intended to renew, the workmen's compensation insurance carried by their father. Roscoe A. Bolton, Vice-President of Alex & Bolton, Inc., local agents handling the business of United States Fidelity & Guaranty Company, testified that after Adraste Landreneau died only the name of the insured was changed and that there was no change in coverage. The record also reflects that the premiums paid by Adraste Landreneau and those paid by his successors were substantially the same. Also evidenced in the record is a policy which expired on July 3, 1961 (this policy must have been issued prior to Adraste Landreneau's death on July 13, 1960), which sets forth the name of the insured as "Adraste Landreneau, d/b/a Landreneau Gin, Mamou, Louisiana." The file memo of Adraste Landreneau's insurer, supra, definitely recites that it was the intention of Adraste Landreneau to cover all of his operations, farm operations as well as residence carpentry. The endorsement on the back of the instant policy, as well as the endorsement on Adraste Landreneau's policy, states that an additional premium was to be paid for farm operations, which we conclude covered residence carpentry as set forth in the insurer's file memo. Under such facts and circumstances, we are constrained to conclude that although the named insured was "Adraste Landreneau Gins, Inc., Mamou, Louisiana", the intended and real insured were Landreneau Enterprises, Adraste Landreneau Gins, Inc., and/or the Estate of Adraste Landreneau. The following statement in Maggio v. State Farm Mutual Automobile Ins. Co., La.App., 123 So.2d 901, 905, is applicable to the present matter:

"The insurer is therefore bound by the knowledge of the true intention of the parties that the insurance policy was issued for the protection also of

Gill as an additional named insured. * * * For if an insurance policy within the actual intention of the parties is issued for the protection of another than the named insured, the insurer may be held to have afforded such protection by the policy, or to be estopped to deny it; and the policy may be equitably reformed to show the true intention of the parties in this regard. * * " See, Christo v. Eagle Star Insurance Company, Ltd., 232 La. 28, 93 So.2d 682; Randazzo v. Insurance Co. of State of Pennsylvania, 196 La. 822, 200 So. 267.

Having found that the intended insured were the Landreneau interests, supra, we conclude that a mutual mistake existed between the insurer and the insured; such mistake was one of terminology—designating the insured as only "Adraste Landreneau Gins, Inc., Mamou, Louisiana", instead of the interests, supra. There is ample authority for the reformation of insurance contracts where, by reason of mutual mistake, the policy as written does not express the actual intent of the parties. The instant policy must therefore be reformed or corrected to recite the true intention of Adraste Landreneau, now deceased, and all his successors. Maryland Casualty Company v. Kramel, La.App., 80 So.2d 897; Easley v. Boston Insurance Company, La. App., 132 So.2d 654.

For the reasons assigned, the judgments of the Court of Appeal, Third Circuit, are reversed and set aside. The judgments of the trial court are affirmed and reinstated. All costs are to be paid by defendants.

HAMITER, J., concurs in the result.